# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59963-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| HOANG MINH DANG, | |
| Appellant. | |

PRICE, A.C.J. — Hoang Minh Dang appeals his convictions for two counts of first degree rape of a child and two counts of first degree child molestation.

Dang[1] argues that (1) the trial court erred in overruling Dang's GR 37 objection to the State's peremptory strike of a prospective juror, (2) the State committed prosecutorial misconduct, including race-based misconduct, (3) trial counsel rendered ineffective assistance by failing to object to the prosecutorial misconduct, (4) the trial court sentenced Dang without a complete presentencing investigation report (PSI), and (5) the trial court imposed unconstitutionally vague or overbroad community custody conditions.

We remand for the trial court to modify and clarify several of Dang's community custody conditions. We otherwise affirm his convictions and sentence.

---

[1] Appellant's briefing uses Dang as his preferred surname. We follow this preference.

FACTS

## I. BACKGROUND

Dang lived with two of his adult sisters for large stretches of time between 2000 and 2015. One sister had two daughters (Dang's nieces): T.A.H. was born in 2001, and A.A.H. was born in 2004. The girls' father was "not very much in the picture." 5 Verbatim Rep. of Proc. (VRP) at 715. Because Dang worked different hours than his sisters, he frequently picked up his nieces from school and supervised them at home.

At some point when the girls were teenagers, they shared with each other that they had each been sexually abused by Dang. In 2022, A.A.H. told their mother about the abuse, and their mother contacted law enforcement.

The State charged Dang with first degree rape of a child and first degree child molestation, one count of each crime for each of the two nieces (four counts total). For each count, the State alleged aggravating factors of an ongoing pattern of sexual abuse and use of a position of trust to facilitate the crime.

## II. TRIAL

### A. JURY SELECTION

Jury selection began in May 2024 in Kitsap County superior court with individual questioning of a selection of prospective jurors based on responses to juror questionnaires.

Juror 13, who self-identified as Pacific Islander, disclosed that he was currently charged with rape of a child, had trial scheduled for August, and was facing a possible sentence of 20 years. Juror 13's case was also in Kitsap County, so he was being prosecuted by the same office—although not the same attorney—that was prosecuting Dang's case. When asked whether facing

similar charges could affect his impartiality, juror 13 responded that the experience would make him "more open-minded." 4 VRP at 252-53. He stated that he was not concerned about sitting as a juror for a trial involving the same crime and that he "would like to hear more details in order to decide if someone's guilty." 4 VRP at 386. Juror 13 denied harboring any resentment against the prosecutor's office, even though he was worried about the outcome of his own case. Juror 13 also stated that he was briefly represented, in his current case, by Dang's defense counsel. And he mentioned knowing three other people who had been accused of sex offenses, at least one of whom went to jail.

The State moved to excuse juror 13 for cause, but the trial court denied the motion. The State then said it would exercise a peremptory challenge to strike juror 13. Defense counsel objected on the basis of GR 37.

The State emphasized that juror 13's current pending charge was for the exact same crime as Dang and that he was being prosecuted by the same office. But Dang contended that the State lacked a race-neutral reason for striking juror 13 because, while the same office was prosecuting both men, the same prosecutor was not. Dang also argued that juror 13's prior contact with law enforcement (due to his arrest in the pending case) and his friendship with other people accused of sex offenses were presumptively invalid reasons for striking him under GR 37.

The trial court rejected Dang's GR 37 challenge; it explained that "the fact that this juror is facing current, ongoing prosecution for the same charge that is presently before this Court is a race-neutral basis" for striking him. 4 VRP at 392.

Meanwhile, another juror, juror 37, reported that he had once been sexually assaulted while in the military but did not report the incident. Juror 37 had also been accused of sexually assaulting

3

another officer, but an investigation determined that those claims were unfounded. At the time of the accusation, juror 37 had been 25 years old, and he was 35 at the time of Dang's trial. Juror 37 stated that he felt having both experiences would give him a "unique perspective" on both "the importance of a fair trial, but also knowing the weight of what something like that does to a victim." 4 VRP at 328. Neither party moved to excuse juror 37.

B. TRIAL TESTIMONY

At trial, several family members testified that the household primarily socialized with other Vietnamese families in the community. A.A.H. testified that the family lived in a multigenerational household and frequently went to a Vietnamese temple, but that she was "pretty accustomed to American culture." 5 VRP at 587. The victims' mother testified that, after the victims' father moved out, the household consisted of her and her daughters, her sister, and Dang. Because of the adults' overlapping work schedules, Dang would frequently pick the girls up from school when they were in elementary and middle school and supervise them until their mother got home. T.A.H. testified that the adults all had authority over the girls, and that she was respectful of Dang's authority.

Later, the children's mother remarried. T.A.H. testified that Dang and her stepfather did not like each other. According to the mother, Dang and the girls' aunt moved out of the family's house in 2014 or 2015 because they did not get along with her new husband.

T.A.H. testified that while Dang lived in the home, Dang sexually abused her, beginning when she was six or seven years old. She described several specific instances when Dang touched or penetrated her vagina with his hand, tongue, and penis. The abuse occurred roughly once a week while she was in elementary school, then less frequently once she entered middle school.

4

The abuse ended completely after Dang moved out when T.A.H. was about 15 years old. T.A.H. stated that many of her memories of the abuse were "flash ones of remembering it happened, and then I don't remember too much of a beginning and end." 5 VRP at 732. Dang told her to keep the abuse "a secret." 5 VRP at 740. She did not tell her mother because she feared "ruining the dynamics of the house" while Dang lived with them and to keep from hurting her mother emotionally after Dang moved out. 5 VRP at 741.

A.A.H. also testified that she was about seven years old when Dang began sexually abusing her. She explained that Dang would touch the outside of her vagina. She also described another incident where Dang penetrated her vagina with his penis when she was about ten years old. A.A.H. testified that Dang inappropriately touched her three or four times over the course of her childhood. And he warned A.A.H. that she would not get to see one of her aunts anymore if she told anyone about the abuse. A.A.H. testified that she feared Dang because he would also get drunk and threaten her with a knife.

A.A.H. testified that she disclosed the abuse to her mother in 2022, even though "me and my sister planned on not telling her until she was about to pass away or at her grave because we know it would hurt her a lot." 5 VRP at 612.

During the initial investigation, both T.A.H. and A.A.H. provided written statements to law enforcement about the abuse, which differed somewhat from their testimony at trial. Defense counsel cross-examined both victims about these differences, using their written statements for impeachment. For A.A.H., defense counsel questioned her about writing that Dang forced her to have sex with him, but not writing "that [he] penetrated [her] vagina with his penis," and about not including in her statement her age at the time the abuse began. 5 VRP at 633. And A.A.H.

admitted, in response to counsel's questioning, that she struggled to differentiate between dreams and memories, and she had recurring nightmares about the abuse.

For T.A.H., defense counsel's impeachment using her written statement included asking about her estimate in her statement that she was raped three times per week and molested almost every day between the ages of 6 and 14. Counsel pointed out that this level of frequency would result in more than 1,200 rapes and 2,400 molestations. Counsel also emphasized that in one part of her written statement, T.A.H. said that the abuse started at "approximately age five or six" and then "age six or seven" in a different spot. 5 VRP at 753. And T.A.H. acknowledged that she never saw Dang threaten A.A.H. or touch her inappropriately. Because the written statements were used only for impeachment, they were marked as exhibits but not admitted into evidence.

C. JURY INSTRUCTIONS, CLOSING ARGUMENTS, AND VERDICT

Among the trial court's instructions to the jury was the instruction that focuses the jury on only admitted evidence:

> The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, stipulations, and the exhibits that [the trial court] admitted, during the trial. If evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict.

Clerk's Papers (CP) at 92.

During closing arguments, the State emphasized that the victims delayed disclosing the abuse in order to protect their mother. The State also discussed the elements of each crime and what incidents fell under each count. The prosecutor then addressed defense counsel's impeachment of the victims, referring to their brain development:

6

> The defense made kind of a big deal on cross-examination of both of the girls about their summaries that they wrote for the police, that it wasn't detailed enough for him.
>
> I'll submit to you that both of the girls testified that that was the first time that they had put pen to paper about what happened to them. They had never tried writing it down before. They had never thought to write it down before.
>
> Frankly, they're still young. They're so young, 19 and just turned 23. *These girls haven't even fully developed their brains yet*, right, and they're not familiar with the legal system. How are they going to know exactly what is required or what is expected to go in a statement like that.

5 VRP at 849-50 (emphasis added). The prosecutor then made a specific reference to defense counsel:

> Maybe they didn't write what a white middle-aged man might have written, what a white middle-aged lawyer might have wanted, but . . . that doesn't draw into question the veracity of their statements. They wrote what they felt about it, and it was the first time of pouring that out.

5 VRP at 850.

The State ended its closing argument by discussing the aggravating factors of both an on-going pattern of sexual abuse and the use of a position of trust to facilitate the crimes. While discussing Dang's use of a position of trust, the prosecutor pointed out Dang's role in the household:

> So sometimes you might think position of trust, that needs to be like something official, and it's not.
>
> His position of trust is the trust that he was given by [the victims' mother] to watch and care for her children. The family trust that she placed in him as her brother, that she felt he was going to act responsibly and take care of her children, and that position of trust that he held in the family, that's what the position of trust in this definition means.
>
> And he did use that to facilitate the commission of the crime, of course. How else would he have had unfettered access to these girls? How else would he have had

their trust and love and willingness to do what he told them to do?  So . . . the State has proven that he used that position of trust as to each charge.

You know, *the defendant was the man of that family*.  After [the victims' mother and] father split up, . . . [t]he defendant was the only man living in this household.  And that continued up until [the victims' mother] got remarried.

If you'll note, shortly after [she] got remarried, the defendant and [the victims' aunt] moved out of that house.  I submit to you he didn't like having another man around.  He wanted to be the one in charge of what was going on in the household.

5 VRP at 853-54 (emphasis added).  The prosecutor then made a reference to a "cultural matter":

*As a cultural matter*, there's deference to the men, to the elders, and you see that play out here as well.  He's the man of the house.  He's the man of the family.  He's in charge, and everyone better do what he wants them to do, and he took advantage of that situation as well, to do what he wanted to with these girls and rape and molest them over and over for their entire childhood.

5 VRP at 854 (emphasis added).  Defense counsel did not object to any of the prosecutor's statements.

During Dang's closing argument, defense counsel asserted that the girls' stories were exaggerated and implausible.  In part, counsel pointed to inconsistencies between the written statements and trial testimony:

I will remind you that the detective who gave them instructions to write these statements told them that they were to include as much detail as possible.  They were to include places, dates, and ages, locations, smells, noises, where on your body, precisely what occurred, how it was done.  This is what the detective was asking for.

You know, it's interesting.  In [A.A.H.'s] statement, she never says that there was any penetrating act.  And [T.A.H.'s] statement talks about these rapes and molestations that occur on a daily basis.

What do we do . . . know, when they wrote these statements, they were alone with their thoughts.

8

They're alone with their thoughts, and they're instructed to include all of this detail. And this is not to make a white middle-aged guy happy. It is to provide the information because details matter, because you, as jurors, have to assess the credibility.

5 VRP at 863-64. In rebuttal, the prosecutor commented, "Maybe our brains work in a way where we try to block things that we don't want to believe." 5 VRP at 866. The prosecutor also addressed the written statements again, urging the jurors to focus on the testimony from the witness stand:

As to the statements [defense counsel] referenced, we didn't have the police officer testify. I didn't hear testimony from any police officer that explained how those questions were asked of the girls. That testimony isn't before you. Those exhibits were never admitted. That evidence is not before you either.

So the circumstances by which they made their initial statement really has no bearing on what their testimony is. The evidence is the testimony that came from the witness stand.

5 VRP at 867-68. And the prosecutor ended their argument with a request to convict:

Again, this defendant has enjoyed his position of authority over these girls for years, his authority over the women in his life, over this family, over his household, and over those children. And he took advantage of that, and he raped them, and he molested them, and he's guilty.

*Don't let him get away with that.* Thank you.

5 VRP at 870 (emphasis added). Defense counsel did not object to any of these statements.

The jury convicted Dang on all four counts. The jury also entered special verdicts finding that each count was part of an ongoing pattern of sexual abuse and that Dang used a position of trust to facilitate his crimes.

D. SENTENCING

The Department of Corrections prepared a PSI that contained an official version of the offense, victim and family impact statements, a criminal history, a risk/needs assessment,

community concerns, a statement from Dang, and the Department's conclusions and sentencing recommendations. One section of the report suggested that there were complications in obtaining a statement from Dang; the report identified "a clear language barrier," and mentioned that the Department used a "Language Link phone service" interpreter to interview Dang. CP at 133.

Dang moved to strike the entire PSI because it contained information not mentioned by any witness at trial and because the interpreter used for Dang's statements was not court certified. Counsel asserted: "I don't believe the statements were made by [Dang]. They were made by an unidentified uncertified interpreter who may or may not be stating what my client said." 6 VRP at 907. Counsel also objected to the inclusion of victim impact statements in the PSI, "but mostly on the grounds that it's cumulative" because "those already appear elsewhere in the record," and counsel acknowledged that crime victims have both a constitutional and statutory right to provide impact statements. 6 VRP at 905-06.

While considering Dang's motion to strike, the trial court expressed concern about moving forward with sentencing with an incomplete PSI. The trial court was concerned that a statute, RCW 9.94A.500(1), required the court to consider a PSI at sentencing, and it asked if sentencing needed to be delayed while another PSI was prepared. But defense counsel expressly asked to move forward with sentencing without the PSI, stating, "I believe that we can go forward with sentencing without the PSI." 6 VRP at 908. Defense counsel characterized the situation as one where the Department "had an opportunity, and they chose to squander it." 6 VRP at 908. The State agreed that the trial court could proceed with sentencing without the PSI.

The trial court explained that it was familiar with the real facts doctrine and accustomed to not considering facts besides those proved at trial. The trial court then decided that it would strike the PSI, with the exception of the victim statements and family concerns portion of the PSI.

The trial court imposed a sentence of 318 months to life for each rape of a child conviction and 198 months to life for each child molestation conviction. The trial court also sentenced Dang to lifetime community custody.

The trial court imposed numerous community custody conditions.[2] Several conditions prohibited Dang from possessing or accessing certain materials:

> [Sex Offense Condition 3:] Possess/access no sexually exploitive materials (as defined by Defendant's treating therapist or [community corrections officer (CCO)]).
>
> . . .
>
> [Sex Offense Condition 5:] Possess/access no sexually explicit materials, and/or information pertaining to minors via computer (i.e. internet)[.]

CP at 157. And two different conditions addressed polygraph examinations:

> [Sex Offense Condition 10:] Submit to periodic polygraph exams at own expense at request of CCO or any treatment provider.
>
> . . .
>
> [Appendix H Condition 19:] Submit to periodic polygraph examinations at own expense at the request of CCO and/or treatment provider to monitor compliance with conditions. Sign all necessary releases of information.

---

[2] The community custody conditions in the main judgment and sentence were imposed in a unenumerated bullet-point list, so we have assigned numbers that correspond with their position on the bullet-points. Unlike the conditions in the main judgment and sentence, the community custody conditions included in Appendix H were numbered, and we have used those numbers where appropriate.

CP at 157, 165.[3]

Dang appeals.

## ANALYSIS

Dang makes several arguments, including (1) the trial court erred in denying his GR 37 objection, (2) the State committed race-based and "conventional" prosecutorial misconduct, (3) he received ineffective assistance of counsel from the failure to object to the State's misconduct, (4) the trial court sentenced him without a complete PSI, and (5) certain community custody conditions are unconstitutionally vague or overbroad.

## I. GR 37

### A. LEGAL PRINCIPLES

GR 37 is intended "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). This court generally applies de novo review to GR 37 rulings that are not based on a trial court's express factual findings or credibility determinations. *State v. Bell*, 5 Wn.3d 54, 64-65, 571 P.3d 272 (2025); *State v. Tesfasilasye*, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022). Because the GR 37 ruling in this case did not involve any factual findings or credibility issues, we apply a de novo standard of review. *Bell*, 5 Wn.3d at 64-65.

"GR 37(c) provides that when a party exercises a peremptory challenge, the opposing party may object to raise the issue of improper bias." *State v. Hale*, 28 Wn. App. 2d 619, 630, 537 P.3d 707 (2023), *review denied*, 2 Wn.3d 1026 (2024). Once there has been an objection, "the party

---

[3] Related to these conditions, the trial court added a handwritten notation directing: "Polygraph/psychosocial evaluations shall be done in a manner that accommodates the defendant's language and reading level/abilities." CP at 165.

exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d).

The trial court then must evaluate the justifications "in light of the totality of circumstances." GR 37(e). "The peremptory challenge must be denied '[i]f the court determines that an objective observer *could* view race or ethnicity as *a* factor in the use of the peremptory challenge.' " *Hale*, 28 Wn. App. 2d at 630 (alteration in original) (quoting GR 37(e)). "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

In assessing a GR 37 objection, the trial court must consider circumstances including the following five factors:

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it,
>
> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors,
>
> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party,
>
> (iv) whether a reason might be disproportionately associated with a race or ethnicity, and
>
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g). "[T]his is not a checklist for trial courts to cross off but, instead, factors to be considered in making a determination." *Tesfasilasye*, 200 Wn.2d at 358.

GR 37(h) provides that certain reasons for striking a juror are presumptively invalid, including the reasons found in (h)(i) of "having prior contact with law enforcement officers" and (h)(iii) of "having a close relationship with people who have been stopped, arrested, or convicted of a crime."

B. ANALYSIS

Dang's GR 37 argument focuses on the State's striking of juror 13. He contends that an objective observer could view race or ethnicity as a factor in the State's exercise of a peremptory challenge. Dang specifically argues that the State's basis was presumptively invalid under GR 37(h)(i) and (h)(iii) because it was "based solely on [juror 13's] contacts with the criminal justice system." Br. of Appellant at 63.

Dang acknowledges that juror 13 was being prosecuted for a similar crime at the same time as Dang's trial. He also concedes that *if* the same deputy prosecutor was involved in both cases, it "could, under some very rare circumstances, be a valid race neutral reason." Br. of Appellant at 57. But he asserts that two different prosecutors, even if in the same office, is insufficient given the broad protections of GR 37. Moreover, Dang points out that juror 37, who had previously been accused of sexual assault while in the military, was not questioned as thoroughly as juror 13 and was not the subject of a peremptory challenge.

The State explains that it struck juror 13 because he had a pending prosecution in Kitsap County for rape of a child, meaning that he was being charged by the same prosecutor's office as Dang and facing the same charge. The State contends that under these specific circumstances, an objective observer could not view race as a factor in the exercise of the preemptory challenge.

We agree with the State for several reasons. First, as an initial matter, we disagree that the State's basis was a presumptively invalid reason under GR 37(h)(i) or (h)(iii). Having "prior contact with law enforcement officers" or "close relationship" with criminally-involved people over the course of a person's life is not the same as having been charged with and presently awaiting trial for the exact same crime as the defendant. GR 37(h)(i), (iii).

Second, the State's basis to strike juror 13 is an objectively persuasive reason. It would be an eminently reasonable concern for the State if the jury included a person who was under active prosecution (and pending trial) for the same crime. Given juror 13's self-interest in his own case, any vote for or against guilt could have been seen as being motivated by this self-interest (to perhaps curry favor with the State or to be vindictive against the State), rather than being narrowly focused on the evidence admitted at Dang's trial. These concerns, which are highly specific to this particular juror's personal circumstances, are not a reason that "might be disproportionately associated with a race or ethnicity." GR 37(g)(iv).

Third, the comparison of juror 37—the juror who was both a victim of and accused of sexual assault while in the military—would not create suspicions in the mind of an objective observer about the State's exclusion of juror 13. Juror 37 had been cleared of wrongdoing a decade before Dang's trial, in contrast to juror 13's imminently pending trial. GR 37(g)(ii), (iii). The two situations share no important similarities.

In sum, after viewing the record de novo, an objective observer could not view race as a factor in the peremptory strike against juror 13. Accordingly, we hold that the trial court did not err by denying Dang's GR 37 objection.

15

II. PROSECUTORIAL MISCONDUCT

Dang argues that the State committed both race-based and "conventional" prosecutorial misconduct during closing arguments.

A. RACE-BASED PROSECUTORIAL MISCONDUCT

Dang argues that the prosecutor committed two instances of race-based prosecutorial misconduct when it made references during closing arguments (1) to the family's culture, and (2) to defense counsel's race. First, Dang contends that the prosecutor referenced Dang's Vietnamese background when it "assume[d] . . . that Mr. Dang was some sort of patriarchal figure." Br. of Appellant at 37. He also asserts that the prosecutor was using Asian stereotypes to cast A.A.H. and TAG "as submissive and sexualized victims." Br. of Appellant at 37. Second, Dang argues that the prosecutor's reference to defense counsel as a "white middle-aged man" was improper. Br. of Appellant at 32. We disagree that these comments constituted race-based prosecutorial misconduct.

1. Legal Principles

"When a defendant claims race-based prosecutorial misconduct, Washington courts apply the objective observer test." *State v. Bellerouche*, 33 Wn. App. 2d 877, 895, 565 P.3d 604 (2025). "Under this objective observer standard, we consider the content and subject of the statements, the frequency of the remarks, the apparent purpose of the statements, and whether the comments were based on evidence or reasonable inferences in the record." *State v. Bagby*, 200 Wn.2d 777, 793, 522 P.3d 982 (2023). This court "must determine whether the State 'flagrantly or apparently intentionally appealed to jurors' potential racial bias' " in a manner such that " 'an objective observer *could* view the . . . comments as an appeal to jurors' potential prejudice, bias, or

stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence.' " *Bellerouche*, 33 Wn. App. 2d at 895 (quoting *Bagby*, 200 Wn.2d at 793). "The objective observer is a person who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination." *State v. Zamora*, 199 Wn.2d 698, 718, 512 P.3d 512 (2022).

Importantly, "this heightened standard does not apply every time a prosecutor mentions race." *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018). "It applies only when a prosecutor mentions race in an effort to appeal to a juror's potential racial bias, i.e., to support assertions based on stereotypes rather than evidence." *Id.*[4]

2. Whether the Prosecutor's Comments Appealed to Jurors' Potential Racial Bias

a. Family culture

Dang first argues that the State committed race-based misconduct when, during closing argument, the prosecutor said that Dang was "the man of that family" who moved out of the house after the victims' mother remarried, and that " '[a]s a cultural matter, there's deference to the men, to the elders.' " Br. of Appellant at 16-17 (emphasis omitted) (quoting 5 VRP at 853-54).

Dang reads too much into the State's closing argument when the full context is considered. In the relevant portion, the State said,

> So sometimes you might think position of trust, that needs to be like something official, and it's not.

---

[4] Division Three has observed that "[w]hile the Supreme Court has applied the heightened scrutiny of race-based misconduct to allegations of nationality and ethnicity-based misconduct, it has not expanded the heightened scrutiny to cultural or religion-based stereotypes." *State v. Darraji*, 34 Wn. App. 2d 410, 429, 568 P.3d 1143, *review denied,* 5 Wn.3d 1021, 578 P.3d 789 (2025). The court commented, "[w]hile religion and culture are closely tied to ethnicity, they are not the same and there may be reasons to apply a different standard." *Id.*

His position of trust is the trust that he was given by [the victims' mother] to watch and care for her children. The family trust that she placed in him as her brother, that she felt he was going to act responsibly and take care of her children, and that position of trust that he held in the family, that's what the position of trust in this definition means.

And he did use that to facilitate the commission of the crime, of course. How else would he have had unfettered access to these girls? How else would he have had their trust and love and willingness to do what he told them to do? So . . . the State has proven that he used that position of trust as to each charge.

You know, the defendant was the man of that family. After [the victims' mother and] father split up, . . . [t]he defendant was the only man living in this household. And that continued up until [the victims' mother] got remarried.

If you'll note, shortly after [she] got remarried, the defendant and [the victims' aunt] moved out of that house. I submit to you he didn't like having another man around. He wanted to be the one in charge of what was going on in the household.

As a cultural matter, there's deference to the men, to the elders, and you see that play out here as well. He's the man of the house. He's the man of the family. He's in charge, and everyone better do what he wants them to do, and he took advantage of that situation as well, to do what he wanted to with these girls and rape and molest them over and over for their entire childhood.

5 VRP at 853-54.

When the State's words are read altogether, we disagree that there was an appeal to the potential racial bias of the jurors. The prosecutor did not use the words "Asian," "Vietnam," or "Vietnamese" at any point during closing arguments. And an assertion that the sole adult male in a household had a position of trust over the household's young children is not a remark that implicates any specific society or culture.[5]

---

[5] Indeed, a reference to a patriarchal structure could hardly be seen as a focus on any particular ethnic or racial group, as ubiquitous as that structure appears to have been throughout human history.

Moreover, these comments about Dang's authority over the victims were supported by the evidence—there was testimony that the children respected Dang's authority in the household, that Dang frequently supervised the girls while their mother was working, and that he moved out after the children's mother remarried. Further, even if the State's very brief reference to culture was intended to be a reference to Vietnamese culture, as opposed to a general patriarchal culture, there was evidence to support that as well. A.A.H. testified that the multigenerational living situation was traditional for Vietnamese families, meaning that households with more members than a standard nuclear family were not uncommon, and that the children in the household respected the adults' authority. And while it is true that the victims were adults by the time of trial, they each testified that the abuse began when they were young children. Nothing supports the argument that the prosecutor was invoking stereotypes of ethnic passivity when they stated the obvious—that young children are vulnerable to being victims of sexual abuse.

We hold that the prosecutor's brief, unspecific references to patriarchal culture were not an attempt to appeal to jurors' potential racial biases that would require applying the race-based prosecutorial misconduct standard. *Sandoval*, 189 Wn.2d at 834.

b. Reference to defense counsel

Dang also argues that we must apply the race-based misconduct standard to the State's comments about defense counsel. When defending the victims' credibility against defense counsel's impeachment with the victims' prior statements to police, the prosecutor commented, "Maybe they didn't write what a white middle-aged man might have written, what a white middle-aged lawyer might have wanted, but . . . that doesn't draw into question the veracity of their statements." 5 VRP at 850. Dang argues that the prosecutor was implying that defense counsel's

race, age, and gender meant that defense counsel was "insensitive to discrimination or trauma experienced by others." Br. of Appellant at 32.

We disagree. While it is certainly true that the prosecutor was attempting to cast defense counsel in an unsympathetic light, this comment appeared to be equally rooted in defense counsel's occupation as a lawyer as it was an attempt to draw attention to his race, and the comment was not an appeal to a juror's potential racial bias. *See Sandoval*, 189 Wn.2d at 834. Accordingly, this reference to defense counsel also falls short of the threshold required to apply the race-based prosecutorial misconduct standard.

Because we determine that the State's comments about Dang's authority over the victims and about defense counsel were not an appeal to the potential racial bias of the jurors, we review all of Dang's prosecutorial misconduct claims through the lens of "conventional" prosecutorial misconduct.

## B. "CONVENTIONAL" PROSECUTORIAL MISCONDUCT

In addition to race-based prosecutorial misconduct, Dang also contends that the prosecutor committed numerous instances of conventional misconduct during closing arguments. Dang's various arguments can be grouped into four categories: (1) facts outside of the record, (2) denigrating defense counsel, (3) misstatements of the law, and (4) improper appeals to passion and prejudice.

"To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.' " *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers,* 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

Dang did not object to any of the prosecutor's statements during closing or rebuttal arguments. "Where a defendant fails to object, we apply a heightened prejudice standard where the defendant must also show that the prosecutor's improper and prejudicial conduct was 'so flagrant and ill[-]intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " *Zamora*, 199 Wn.2d at 709 (alterations in original) (internal quotation marks omitted) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). In other words, they must show that " 'no curative instruction would have obviated any prejudicial effect on the jury' and that 'the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict.' " *State v. Crossguns*, 199 Wn.2d 282, 299, 505 P.3d 529 (2022) (internal quotation marks omitted) (quoting *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012)). "The focus of this heightened standard is whether an instruction would have cured the prejudice." *State v. Jarvis*, 27 Wn. App. 2d 87, 106, 530 P.3d 1058, *review denie*d, 2 Wn.3d 1003 (2023).

### 1. Facts Outside the Record

Dang first points to several assertions from the State that he contends were not supported by evidence admitted at trial, including (1) comments on the victims' brain development, and lack of familiarity with the legal system, and (2) suggestions that Dang moved out because he did not want another man in the house. He also contends that the State's comments about a patriarchal culture were also not based on facts in evidence. We disagree these comments were misconduct.

"Prosecutors have wide latitude to argue reasonable inferences from the evidence in closing argument." *State v. Houser*, 30 Wn. App. 2d 235, 272, 544 P.3d 564, *review denied,* 3 Wn.3d 1015 (2024). But a prosecutor acts improperly if they "submit evidence to the jury that has not been admitted at trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673

(2012). "A prosecutor may not suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).

First, with respect to the State's comments about the victims' brain development and lack of familiarity with the legal system, these statements came from its closing argument when it was discussing impeachment of the victims' testimony with their prior statements to police:

> The defense made kind of a big deal on cross-examination of both of the girls about their summaries that they wrote for the police, that it wasn't detailed enough for him.

> I'll submit to you that both of the girls testified that that was the first time that they had put pen to paper about what happened to them. They had never tried writing it down before. They had never thought to write it down before.

> Frankly, they're still young. They're so young, 19 and just turned 23. *These girls haven't even fully developed their brains yet, right, and they're not familiar with the legal system.* How are they going to know exactly what is required or what is expected to go in a statement like that.

5 VRP at 849-50 (emphasis added).

These statements were reasonable inferences from the evidence. The victims were about 18 and 21 respectively when they wrote their statements to law enforcement. Asserting that the victims were young and lacked familiarity with the legal system was clearly inferable from evidence at trial about the victims' ages and the lack of any testimony about prior trouble with the law. And a single passing comment about their incomplete brain development—when one was 18 and the other was 21 at the time they wrote their statements—was not outside the realm of a reasonable inference from the evidence.

Next, overlapping with his race-based misconduct arguments, Dang challenges the prosecutor's statement that Dang was the "man" of the family and moved out of the house because

"he didn't like having another man around." Br. of Appellant at 17 (quoting 5 VRP at 854), 27. According to Dang, this characterization, plus the prosecutor's implication that victims were "submissive and sexualized victims" because they were Asian were facts not found in the record. Br. of Appellant at 37.

We disagree that these statements were not reasonable inferences from the evidence. First, T.A.H. testified that Dang frequently supervised the girls while their mother worked, and that she respected his authority. Further, the victims each testified that the abuse began when they were roughly seven years old—an age when a child would reasonably be expected to defer to an adult. Next, the victims' mother testified that Dang and the girls' aunt moved out because they did not get along with her new husband. And Dang was the only man living in the household until the mother remarried.

Taken together and viewed in the context of the prosecutor's argument that Dang used a position of trust to facilitate his crimes, the prosecutor's statements were reasonable inferences from this testimony. *Thorgerson*, 172 Wn.2d at 442. Dang was the only man in the house, and he had authority over the young victims because they were under his supervision while their mother was at work, not simply because they were female or happened to be of Asian descent. And while there was conflicting testimony about why Dang moved out of the house, two different witnesses testified that Dang did not get along with the victims' stepfather and that the abuse stopped after Dang moved out of the house. Speculating that having another man in the house interfered with Dang's ability to abuse the victims was also not an unreasonable inference. *Houser*, 30 Wn. App. 2d at 272.

In sum, we hold that the prosecutor did not make arguments about facts outside the record.[6]

2. Denigrating Defense Counsel

Dang argues that the prosecutor "demean[ed] counsel for being a white middle-aged man," which, he contends, constituted both race-based and conventional misconduct. Br. of Appellant at 32. Having previously rejected the argument that these comments were an appeal to jurors' potential racial biases, we turn to Dang's argument that the comments constituted conventional misconduct.

"Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *State v. Lindsay*, 180 Wn.2d 423, 432, 326 P.3d 125 (2014). Courts have held that it was improper for prosecutors to refer to defense counsel's presentations as "bogus" or "a crock," accuse defense counsel of twisting witnesses' words, or imply that defense counsel's only purpose is to lie and distort facts. *Lindsay*, 180 Wn.2d at 433 (listing cases); *Thorgerson*, 172 Wn.2d at 450.

Here, the prosecutor argued that the victims did not lack credibility despite differences between their written statements to police and trial testimony. The prosecutor said, "Maybe they didn't write what a white middle-aged man might have written, what a white middle-aged lawyer might have wanted, but . . . that doesn't draw into question the veracity of their statements." 5 VRP at 850. While unprofessional, the comment falls short of being improper in terms of

---

[6] Dang appears to argue in passing that the prosecutor improperly testified during closing by saying, "Maybe our brains work in a way where we try to block things that we don't want to believe." 5 VRP at 866; *see* Br. of Appellant at 19. This isolated statement, prefaced with "maybe," is better characterized as permissible rhetorical argument, not impermissible argument about facts outside of the record.

prosecutorial misconduct. The comment did not imply "deception and dishonesty" on the part of defense counsel, and it was focused on responding to, and challenging the quality of, the impeachment evidence before the jury. *Lindsay*, 180 Wn.2d at 433. The comment was also isolated, unlike the repeated occurrences that permeated the trials in *Lindsay* and *Thorgerson*.[7] *Thorgerson*, 172 Wn.2d at 450-51; *Lindsay*, 180 Wn.2d at 432.

Although counsel should always endeavor to be cordial in front of a jury, we hold that the prosecutor's isolated reference to defense counsel was not improper in the sense required for prosecutorial misconduct.

3. Misstatements of the Law

Next, Dang insists that the prosecutor misstated the law by telling the jury to disregard testimony about A.A.H. and T.A.H.'s prior statements to law enforcement. He specifically points to the following comments from the State's closing argument:

> [W]e didn't have the police officer testify. I didn't hear testimony from any police officer that explained how those questions were asked of the girls. That testimony isn't before you. Those exhibits were never admitted. That evidence is not before you either.
>
> So the circumstances by which they made their initial statement really has no bearing on what their testimony is. The evidence is the testimony that came from the witness stand.

5 VRP at 867-68. Dang reasons that because the jury instructions directed the jury to consider all of the testimony, including impeachment testimony, "it was misconduct to misstate the law by telling the jury to disregard" the evidence about the impeachment exhibits. Br. of Appellant at 28.

---

[7] And had defense counsel objected, a brief instruction from the trial could would have cured any minimal prejudice.

"When the State's attorney misstates the law, this amounts to improper comments in the context of prosecutorial misconduct." *State v. Sanchez*, 30 Wn. App. 2d 402, 408, 544 P.3d 1107 (2024). And "the prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *Russell*, 125 Wn.2d at 87.

Dang argues that the prosecutor was improperly directing the jury to ignore the impeachment testimony. We read the prosecutor's comments differently. As an initial matter, the prosecutor's rebuttal argument was clearly responding to defense counsel's statements. *Id.* The prosecutor's statements followed defense counsel's closing, during which defense counsel specifically focused on the written statements to law enforcement. 5 VRP at 863 ("[T]he detective who gave them instructions to write these statements told them that they were to include as much detail as possible.").

Further, the comments were factually accurate—no law enforcement officer testified about the instructions the victims were given before they wrote their statements, and the victims' written statements were not admitted as exhibits. The prosecutor did not misstate the law by pointing out those facts. Moreover, the prosecutor did not direct the jury to disregard admitted evidence—to the contrary, the prosecutor emphasized that the testimony on the stand (which inherently included the impeachment on cross-examination) was the only admitted evidence.[8] The prosecutor was accurately pointing out that the written statements themselves were never admitted as evidence. Thus, because the prosecutor did not misstate the law, the comments were not improper.

---

[8] The jury instructions provided: "The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, stipulations, and the exhibits that [the trial court] admitted, during the trial. If evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict." CP at 92.

4.  Appeal to Passion and Prejudice

Next, Dang argues that the prosecutor improperly appealed to the jury's passion and prejudices at the conclusion of his rebuttal argument.  The State finished its rebuttal with,

> Again, this defendant has enjoyed his position of authority over these girls for years, his authority over the women in his life, over this family, over his household, and over those children.  And he took advantage of that, and he raped them, and he molested them, and he's guilty.
>
> *Don't let him get away with that*.  Thank you.

5 VRP at 870 (emphasis added).  Dang argues that it was misconduct for the State to "suggest[] that voting 'not guilty' would let Mr. Dang 'get away' with serious crimes where the focus of the jury should be whether the State proved the case beyond a reasonable doubt, not on any possible punishment."  Br. of Appellant at 29.  He reasons that this comment was improper because it "preys on the jury's fears and diminishes the burden of proof."  Br. of Appellant at 29.  We disagree.

"Jurors should not be made to feel responsible for ensuring that the criminal justice system is effective in protecting children."  *State v. Smiley*, 195 Wn. App. 185, 195, 379 P.3d 149, *review denied*, 186 Wn.2d 1031 (2016).  Accordingly, emotional appeals "to send a message to *society* about the general problem of child sexual abuse" are improper.  *State v. Bautista-Caldera*, 56 Wn. App. 186, 195, 783 P.2d 116 (1989), *review denied*, 114 Wn.2d 1011 (1990).  This court has held that a prosecutor committed misconduct in part by stating that if the jury believed the defendant's argument, " 'then the State may as well just give up prosecuting these cases.' "  *State v. Thierry*, 190 Wn. App. 680, 688, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015 (2066) (emphasis omitted) (quoting the record).  Similarly, a prosecutor may commit misconduct by repeatedly

invoking "a thematic narrative designed to appeal to a broader social cause," such as the war on drugs. *Loughbom*, 196 Wn.2d at 70.

But " '[a] prosecutor is not muted because the acts committed arouse natural indignation.' " *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v. Fleetwood,* 75 Wn.2d 80, 84, 448 P.2d 502 (1968)). A prosecutor's argument that "detail[s] the circumstances of the crime . . . is permissible so long as the argument does not invite an irrational or purely subjective response." *State v. Gentry*, 125 Wn.2d 570, 644, 888 P.2d 1105 (1995).

Here, the passage Dang identifies was entirely centered around the circumstances of the charged crimes and to Dang, specifically, as the defendant. Simply because the allegation of yearslong sexual abuse of two children naturally arouses indignation does not make the statements improper. *Gentry*, 125 Wn.2d at 644; *Borboa*, 157 Wn.2d at 123. There was no appeal to broader social issues or implication that the State would cease prosecuting child sexual assault cases if the jury acquitted Dang. And the request to the jury to not let Dang "get away with" the alleged crimes is best characterized as a summation of the prosecutor's case, not an improper appeal to send a message to society. *See Bautista-Caldera*, 56 Wn. App. at 195; *also State v. Wasuge*, 32 Wn. App. 2d 226, 238, 555 P.3d 910 (2024) (acknowledging that prosecutors may land "hard blows" so long as they do not land "low ones"), *aff'd,* 5 Wn.3d 877, 582 P.3d 320 (2026). Thus, we hold that the prosecutor's comments were not improper.

III. INEFFECTIVE ASSISTANCE OF COUNSEL

Dang also argues that his trial counsel was ineffective for failing to object to the alleged prosecutorial misconduct. If a prosecutor's arguments are not improper, then defense counsel's failure to object does not constitute ineffective assistance. *State v. Larios-Lopez*, 156 Wn. App.

257, 262, 233 P.3d 899 (2010). Because none of the prosecutor's comments were improper, Dang's ineffective assistance of counsel claim fails.[9]

IV. PSI

Dang argues that the trial court erred by striking portions of the PSI rather than requiring the Department to prepare another report with a court certified interpreter. His reply clarifies that the fact that the trial court considered the victim statement from the PSI is not the point of his assignment of error. As Dang asserts, the basis for reversal is "not that the judge considered the opinions of the alleged victims but that she did not have full information" before sentencing Dang. Reply at 27. Thus, Dang asserts that we should remand for resentencing "with a full [Department] presentence report." Br. of Appellant at 70. We disagree.

"The invited error doctrine is meant to prohibit a party from 'setting up an error at trial and then complaining of it on appeal.' " *State v. Kelly*, 4 Wn.3d 170, 194, 561 P.3d 246 (2024) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 312, 979 P.2d 417 (1999)). The invited error doctrine is applicable when the defendant either " 'affirmatively assented to the error, materially contributed to it, or benefited from it.' " *State v. Kelly*, 25 Wn. App. 2d 879, 885, 526 P.3d 39, 43 (2023), *aff'd,* 4 Wn.3d 170, 561 P.3d 246 (2024) (quoting *State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009)).

---

[9] Even if we were to evaluate whether defense counsel was ineffective for failing to object to the comment referencing defense counsel, Dang has not shown that prejudice arose from the isolated, fleeting reference to defense counsel. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018) (because a defendant claiming ineffective assistance of counsel must establish both deficient performance and prejudice, "a failure to show either prong will end the inquiry").

Here, Dang moved to strike the entire PSI. When the trial court expressed concern about proceeding without a PSI, defense counsel did not move to continue sentencing so that another PSI could be prepared, despite the trial court's express question about whether it should delay sentencing. Instead, defense counsel specifically stated, "I believe that we can go forward with sentencing without the PSI." 6 VRP at 908. Thereafter, the trial court went forward with sentencing considering *only* the victim statements from the PSI (which Dang contends is not part of his assignment of error) and struck the rest. Thus, Dang clearly affirmatively assented to any error in the trial court considering a PSI that did not discuss his background. We hold that the invited error doctrine bars review of this issue.[10] *Larry*, 28 Wn. App. 2d at 694.

V. COMMUNITY CUSTODY CONDITIONS

Dang argues, and the State partially concedes, that several community custody conditions regarding sexually exploitive materials, information pertaining to minors, and polygraph exams are unconstitutionally vague or overbroad. We agree that several of the community custody should be remanded to the trial court.

"We review community custody conditions for abuse of discretion." *State v. Johnson*, 197 Wn.2d 740, 744, 487 P.3d 893 (2021). "A trial court abuses its discretion if it imposes an unconstitutional condition." *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). A community custody condition is unconstitutionally vague if the condition " 'does not define the

---

[10] Although Dang's reply brief clarifies that his claim is *not* related to the trial court's consideration of the victims' statements portion of the PSI, Reply at 27, to the extent that Dang still argues that the trial court's decision to consider the victim impact statements contained in the PSI was erroneous, any error was harmless because—as defense counsel acknowledged—similar statements were elsewhere in the record and the victims both made statements at sentencing.

criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed,' " or if it " 'does not provide ascertainable standards of guilt to protect against arbitrary enforcement.' " *State v. Bahl*, 164 Wn.2d 739, 752-53, 193 P.3d 678 (2008) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990)).

A.  SEXUALLY EXPLOITATIVE MATERIALS

Sex Offense Condition [3] directs that Dang,

Possess/access no sexually exploitive materials (as defined by Defendant's treating therapist or CCO).

CP at 157.  Dang argues that this condition is unconstitutionally vague and should be amended to refer specifically to the sexual exploitation of minors as defined by RCW 9.68A.040.  The State points to caselaw holding the condition is not unconstitutionally vague but concedes that "[g]iven the difficulty with interpretation in this case" and Dang's "lack of command of the English language," the "condition should be made more definite as argued by Dang."  Br. of Resp't at 62.

We note that a "community custody condition 'is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct.' " *State v. Nguyen*, 191 Wn.2d 671, 679, 425 P.3d 847 (2018) (quoting *City of Seattle* v. *Eze,* 111 Wn.2d 22, 27, 759 P.2d 366 (1988)).  But in light of the State's concession and being cognizant of the specific facts of this case, we remand for the trial court to clarify the condition by referencing the crime of sexual exploitation of a minor, as defined in RCW 9.68A.040, as well as the definition of sexually explicit conduct in RCW 9.68A.011(4), a term that is referenced in RCW 9.68A.040.

B.   SEXUALLY EXPLICIT MATERIALS AND/OR INFORMATION PERTAINING TO MINORS VIA COMPUTER (I.E. INTERNET)

Sex Offense Condition [5] directs that Dang,

Possess/access no sexually explicit materials, and/or information pertaining to minors via computer (i.e. internet).

CP at 157.  Dang contends that the trial court must clarify this condition because it does not clearly state what information or materials he is prohibited from accessing.  The State concedes that "[t]he condition should be modified to include use of an appropriate filter 'tailored to [Dang's] risk to the community.' "  Br. of Resp't at 63 (second alteration in original) (quoting *State v. Amaro*, No. 56915-9-II, slip op. at 16 (Wash. Ct. App. Aug. 15, 2023) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2056915-9-II%20Unpublished%20Opinion.pdf).  Rather than accept the State's concession to include the requirement of a filter, we remand the condition to the trial court to further define its terms.

The condition's plain language appears to have some deficiencies.  It does not indicate whether the descriptor "sexually explicit" applies only to "materials" or also to "information pertaining to minors."  It is also unclear whether "pertaining to minors" modifies "sexually explicit materials" or only "information."  Further, it is unclear whether "via computer (i.e. internet) applies to the entire condition, or only to "information pertaining to minors."

As written, the condition could prohibit Dang from a range of activities, including possessing/accessing sexually explicit materials, or possessing/accessing *any* information pertaining to minors via a computer or the Internet.  Further, no statute defines "information pertaining to minors" and the term does not have a dictionary definition.  This condition could arguably prohibit Dang from streaming any film or television show featuring an actor under the

age of 18 or reading any news article that makes passing mention of a minor or minors in general. Simply put, the condition does not give an ordinary person notice of what conduct is proscribed and does not provide ascertainable standard of guilt to protect against arbitrary enforcement. *Bahl*, 164 Wn.2d at 752-53. Adding a reference to an Internet filter would not necessarily cure the vagueness.

The proper remedy for an unconstitutionally vague condition is to remand to the trial court for further definition of the terms. *Padilla*, 190 Wn.2d at 684. Accordingly, we remand for the trial court to clarify the condition with the deficiencies discussed above in mind.

C. POLYGRAPH EXAMINATIONS

Finally, two different conditions addressed polygraph examinations. Sex Offense Condition [10] requires Dang to,

> Submit to periodic polygraph exams at own expense at request of CCO or any treatment provider.

CP at 157. And Appendix H Condition 19 requires Dang to,

> Submit to periodic polygraph examinations at own expense at the request of CCO and/or treatment provider to monitor compliance with conditions. Sign all necessary releases of information.

CP at 165. Dang argues that these conditions requiring polygraph examinations should be modified to ensure that the testing is conducted only to monitor compliance with treatment or other supervision conditions. Because the State concedes that we should remand Dang's judgment and sentence on other grounds, it does not object to amending these conditions on remand to limit "the use of the polygraph to questions of supervision or treatment compliance." Br. of Resp't at 65.

It is well established that "[p]olygraph testing may be utilized to monitor compliance with the requirement of making reasonable progress in treatment or with other special conditions of community supervision." *State v. Combs*, 102 Wn. App. 949, 952, 10 P.3d 1101 (2000). Because the State does not object and because we are remanding Dang's judgment and sentence on other grounds, on remand the trial court should expressly limit the use of polygraph testing to monitoring Dang's compliance with treatment and other community custody conditions.

CONCLUSION

We remand for the trial court to modify and clarify the challenged community custody conditions. We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, A.C.J.

We concur:

_____
GLASGOW, J.

_____
CRUSER, J.